UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

TERRY J. ECKLES, )
    *Plaintiff*, )
)
*vs*. ) 1:09-cv-00731-JMS-DML
)
CSX TRANSPORTATION, INC., )
    *Defendant*. )
)

# ORDER

Presently before the Court in this action involving the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-213, are the parties' cross-motions for summary judgment. [Dkts. 28, 43.][1]

## I.
### SUMMARY JUDGMENT STANDARD

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Nevertheless, "the Court's favor toward the non-moving party does not extend to drawing infer-

---

[1] The Court notes that Defendant CSX Transport, Inc. ("CSX") has objected to Plaintiff Terry J. Eckles' cross-motion for summary judgment as untimely under the case management plan. [Dkt. 45 at 8-9.] The Court overrules that objection. The Court's Practices & Procedures specifically call for a cross-motion on "mirror image" legal issues to be filed contemporaneously with the response to an earlier-filed summary judgment motion, so as to reduce the total number of briefs on those mirror issues. [Dkt. 36 at 2.] Mr. Eckles here complied with that directive. Furthermore the objection is moot because, for reasons explained below, CSX is ultimately entitled to summary judgment.

ences that are supported by only speculation or conjecture." *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010). The non-moving party must set forth specific facts showing that there is a material issue for trial. Fed. R. Civ. Pro. 56(e); *Celotex*, 477 U.S. 317. The key inquiry is the existence of evidence to support a plaintiff's claims or affirmative defenses, not the weight or credibility of that evidence, both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999).

Cross-motions for summary judgment do not automatically mean that all questions of material fact have been resolved. *Franklin v. City of Evanston*, 384 F.3d 838, 842 (7th Cir. 2004). The Court must evaluate each motion independently, making all reasonable inferences in favor of the nonmoving party with respect to each motion. *Id.* at 483.

Because the Court ultimately concludes that summary judgment should issue in favor of CSX, the Court will view the evidence in the light most favorable to Mr. Eckles.

## II.
### BACKGROUND[2]

Mr. Eckles has epilepsy. In 1993, he had a grand mal seizure while at work, causing him to fall down and cut himself on a piece of glass. [Dkt. 31-1 at 28-29.] At that time, he worked as a "yardmaster" for Consolidated Rail Corporation ("Conrail") at its Hawthorne Yard in Indianapolis. [*Id.* at 27.] He has continued in that position since CSX purchased Conrail in 1999, [dkt. 44-1 at 1], meaning that he remained the person at the train yard who supervised trainmen as

---

[2] CSX has raised a hearsay objection to Mr. Eckles' attempt to testify as to what one CSX employee said that another CSX employee said. [*Compare* dkt. 45 at 2, *with* dkt. 44 at 5.] Mr. Eckles failed to respond to that objection and thus has made no showing that the statement qualifies as an admission of a party opponent or meets any hearsay exception. *See* Fed. R. Evid. 801(d). The Court will, therefore, sustain that objection. The Court will also sustain CSX's objection to Mr. Eckles' attempt to offer a lay medical opinion. [*Compare* dkt. 45 at 9, *with* dkt. 44-1.] The Court interprets Mr. Eckles' failure to respond to the objection as an acknowledgment that the lay opinion violates Federal Rule of Evidence 701.

they took apart and reassembled trains in a safe and efficient manner, [dkt. 28-3 ¶5]. Since May 2010, he has, however, performed that job at CSX's Anderson facility. [Dkt. 44-1.]

After his 1993 seizure, Conrail placed medical restrictions upon Mr. Eckles' work duties: He wouldn't operate hazardous machinery, climb or work on heights, or work around moving equipment; he would avoid electrical, mechanical, and chemical hazards; and he would only occasionally work the third shift. [Dkt. 31-6 at 29.] In 1999, CSX told Mr. Eckles that it would continue his medical restrictions begun while he was still a Conrail employee. [Dkt. 31-6 at 35.]

Mr. Eckles' Statement of Undisputed Facts asserts that CSX "unilaterally imposed" the restrictions upon him, which he never wanted, and that he told Conrail and CSX that he didn't need them. [Dkt. 44 at 3-4.] Those assertions are, however, inconsistent with the allegations in his Complaint. There, among other things, he alleges that the restrictions "[w]ere and still are reasonable accommodations for his disability," and that the restrictions had been jointly placed upon him "by his own physician and his employer's insurance carrier's physician." [Dkt. 1 at 4.] Indeed, he alleges that being "forced" to work the third shift in 1993 caused him to suffer the seizure. [*Id.*] Those allegations are also inconsistent with his previous ADA lawsuit against Conrail and the Union, in which he unsuccessfully claimed that his restrictions entitled him to a preference in scheduling and worksite that his seniority wouldn't otherwise qualify him for under the terms of the collective bargaining agreement. *See Eckles v. Consolidated Rail Corp.*, 94 F.3d 1041, 1045 (7th Cir. 1996).

Whether he ever wanted the restrictions or not, CSX asked Mr. Eckles multiple times to provide updated medical information about his continuing need for the restrictions. By and large, Mr. Eckles was uncooperative.

First, in 2001, CSX sent him a letter containing the following request for updated information:

> Upon review of your medical file, I note that you were qualified to work with restrictions in October 1993. In order to maintain your restrictions, please have your physician send me an update on your seizure disorder….Please forward this information to my office within the next thirty days or by July 20, 2001.

[Dkt. 31-6.]

Receiving no written response to that letter, CSX again requested updated information, this time in a letter sent by certified mail in January 2004:[3]

> Upon review of your file, I note that there was no response to my June 20, 2001 letter. In order to maintain your work restrictions, you should have your physician forward to me an update regarding your seizure disorder….This information should be forwarded to my office within the next 30 days or by February 7, 2004.

[Dkt. 31-6 at 37.] Mr. Eckles testified in his deposition that he didn't respond to this second letter because, in his view, doing so would "finally" result in his work restrictions being released, permitting him to "work the same as any other employee." [Dkt. 31-2 at 41.] In an email that he wrote to CSX on February 8, however, he did agree to give his neurologist the form at his next appointment, which was scheduled for "several…months" later, even though he felt he was being "singled out" and that other employees with medical conditions "have [n]ever been asked for anything close to what you are asking of me." [Dkt. 31-6 at 41.] At his deposition, Mr. Eckles didn't recall whether he had ever given the letter to his doctor. [Dkt. 31-2 at 48.]

CSX asked Mr. Eckles for updated information for a third time, in October 2007, in a letter from a terminal superintendent: "According to CSX records, your medical restrictions have expired. Be advised that CSX will not honor any past medical restrictions you may have had. If

---

[3] Mr. Eckles has testified that his wife called CSX after he received the letter and, based on the telephone call, that his wife reported that "it was all taken care of." [Dkt. 31-2 at 39.] Neither side relied upon that testimony in their Statements of Undisputed Facts.

you feel your present medical restriction requires a restriction, you must submit a completed MD-3. This form must be completed by your personal physician…." [Dkt. 31-6 at 43.] Shortly thereafter his supervisor wrote him:

> You have mentioned to me in past conversations that you have or have had work restrictions placed on you in the past and that you are unable to do double or work third shift and that such a work schedule would interrupt your medication schedule.
>
> I am instructing you to take the enclosed MD-3 to your physician and have it completed and returned to CSXT's medical department for review by November 9. We need to know if you have any medical condition requiring a work restriction….

[Dkt. 31-6 at 45.]

Rather than having his doctor complete the MD-3, Mr. Eckles wrote to CSX's division manager on November 1, 2007, complaining that his supervisor had told him that his medical restrictions remained in effect while the October 17 letter indicated that they had expired, and he didn't know whether he should or shouldn't work in accordance with his restrictions. [Dkt. 31-6 at 47-48.] The division manager wrote back, in part:

> Among other things, you have not been required to [work] third shift jobs because of medical restrictions developed from information obtained from your doctor over 17 years ago, prior to your employment by CSXT. [The October 2007 letter] did not mean that CSXT was going to immediately require you to perform duties that were inconsistent with those past restrictions….
>
> So that there is no confusion about any work restrictions you might currently have, you are instructed to have your physician complete the enclosed MD-3 and return it to the Medical Department no later than November 30, 2007. Until then, you will remain on your current position and your prior restrictions will be honored.

[Dkt. 31-7 at 6.]

Again, Mr. Eckles declined to have his doctor complete the MD-3. On November 25, he wrote back to the division manager saying: "[U]nder the Americans with Disabilities Act…I am

not required to undergo a medical examination at this time because I have provided the medical information required and my medical information has not changed." [Dkt. 31-7 at 8.] He included as an attachment a CSX letter from 1999 assuring him that he would "continue to work with the same restrictions [he] had on Conrail [once he became a CSX employee]." [Dkt. 31-3 at 31-32; 31-6 at 35; 31-7 at 8.]

The exchange of letters continued. On December 4, 2007, his division manager replied in part: "[T]he 1999 letter [regarding the continuation of restrictions] does not state that the CSXT Medical Department would never request updated information from you. In fact, as you know, the Medical Department requested updated information from you in 2001 and 2004, but their files do not show that you ever provided that information to them." [Dkt. 31-7 at 10.] The division manager went on to again request updated medical information. [*Id.*] On December 17, 2007, Mr. Eckles finally provided updated information from his doctor, who wrote:

> To Whom It May Concern:
>
> I have treated Terry Eckles since the onset of his seizure disorder in 1992. I have provided his employer with answers pertaining to his illness on countless occasions, including filling out railroad forms, sending my diagnosis, and giving a deposition for a Federal Court Case that took hours in the mid 1990's.
>
> I continue to treat Terry. Terry's condition has not changed.
>
> Please direct any further questions for me to/through Terry Eckles and/or his attorney.

[Dkt. 31-7 at 14.]

In February 2008, CSX disqualified Mr. Eckles from the list of yardmasters who were "guaranteed extra board" ("GEB"), a pool of employees paid whether they work or not on the condition that they be available on short notice to fill in if a regularly scheduled employee is unable to work. [*See* dkt. 1 at 7-8; dkt. 29 at 10.] Previously CSX had excused Mr. Eckles from

having to be available to cover third shifts, even though the collective bargaining agreement requires yardmasters on the GEB to be available to cover all shifts. [Dkt. 28-2 at 22; dkt. 29 at 10; dkt. 44 at 3.] CSX stopped doing so in February 2008 because a regular yardmaster position opened up that Mr. Eckles' seniority enabled him to fill, one that was consistent with Mr. Eckles' medical restrictions even without accommodation from CSX. [Dkt. 1 at 7-8; dkt. 29 at 10; dkt. 44 at 3.] The position was less desirable because Mr. Eckles had to actually work to be paid, not merely be available to work. Mr. Eckles worked in that position until October 2008, earning more per day than he had under the GEB and generally agreeing to work more overtime than he had before. [Dkt. 28-5; dkt. 29 at 10; dkt. 44 at 3.] In October 2008, Mr. Eckles used his seniority to transfer to his current work location, where he earns about twice what he did before, while working on the second shift and without needing any accommodations. [Dkt. 44-1.]

In addition to his 1993 seizure, Mr. Eckles' medical records indicate that he also reported a seizure at work in 1996, which caused "a loss of consciousness for an unspecified period of time [until he] was found by a co-worker. He did not tell his work regarding this episode." [Dkt. 45-1 at 1.] And a medical record indicates that he lost consciousness twice in late September / early October 1997, reportedly for "as long as 3 hours." [*Id.* at 2.] One of those episodes resulted in a trip to the emergency room. [*Id*.] Nonetheless, citing only a February 8, 2004 email that he wrote to his employer to that effect, Mr. Eckles asserts that he has "had no medical problems at all since 1993." [Dkt. 44 at 5; dkt. 31-6 at 41.] And by affidavit he avers that he has "had no work related incidents caused by or related to … epilepsy in the past seventeen years." [Dkt. 44-1.] In his deposition, however, he did admit to suffering "breakthrough seizures" in 2009, which he describes as hand shaking. [Dkt. 31-2 at 33.]

**II.**
**DISCUSSION**

Mr. Eckles' brief in opposition to CSX's motion for summary judgment and in support of his own cross-motion for summary judgment abandons all potential causes of action asserted in the Complaint except for two. [*See* Dkt. 44 at 2.][4] First, he claims that CSX violated the ADA by asking him to provide updated medical information regarding his epilepsy. Second, he claims that CSX also violated the ADA by "imposing" workplace restrictions upon him that he didn't want. The Court will examine each claim in turn.

**A. CSX's Attempt to Obtain Updated Medical Information**

Employers subject to the ADA "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). According to Mr. Eckles, CSX violated this provision by asking him to provide updated medical information "[d]espite the fact that Terry had had no problems since the single incident in 1993 and [without] … any reason to suspect that Terry was a danger to himself or others…." [Dkt. 44 at 6.]

Mr. Eckles' version of the facts, based upon a conclusory lay affidavit and an unsworn email, may not be sufficient to create a genuine issue of fact as to his medical health. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."); *Evans v. City of Chicago*, 434 F.3d 916, 924 (7th Cir. 2006) ("However, bare allegations not supported by specific facts are not sufficient in opposing a motion for summary judgment." (quotation omitted)). As indicated above, Mr. Eck-

---

[4] Mr. Eckles filed no reply brief in support of his motion.

les' medical records indicate that he has suffered seizures, of varying degrees, since 1993—including one that occurred on the job that Mr. Eckles hid from his employer. [Dkt. 45-1.] By filing no reply in support of his motion for summary judgment, Mr. Eckles has offered no evidence or argument to suggest any inaccuracy in those third-party medical records.

The Court need not, and will not, decide the effect of Mr. Eckles' evidence about his alleged good health because that evidence, even if credited, doesn't permit him to withstand CSX's motion for summary judgment. CSX's requests for updated medical information were both job-related and consistent with business necessity. Because Mr. Eckles was responsible for maintaining the safety of his subordinates at the worksite, CSX was entitled to ask Mr. Eckles about his continuing ability to perform those duties. *Cf. Amarigilio v. AMTRAK*, 941 F. Supp. 173 (D.D.C. 1996) (upholding refusal to permit an employee diagnosed with diabetes to return to work as a train attendant when employee refused to provide certification from doctor as to his fitness for duty, given potential impact on the safety of others from uncontrolled diabetes). Furthermore, because CSX had previously extended accommodations to Mr. Eckles, it had a legitimate business purpose in ensuring that those accommodations remained necessary. *See Mudra v. Sch. City of Hammond*, 2004 U.S. Dist. LEXIS 27829, *18 (N.D. Ind. 2004) ("In this case, Mudra seeks to turn this statutory shield into a sword that would allow her to claim protection under the ADA, but then prevent her employer from taking reasonable steps to comply with the law by engaging in the interactive process [necessary to determine the scope of the accommodations needed].").

While Mr. Eckles makes much of the number of requests that CSX made of him, the number of requests doesn't suggest that CSX was engaging in discrimination against the disabled. In determining the scope of appropriate accommodations, the ADA requires "good faith

and reasonable effort" on the part of both the employee and the employer. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996). CSX's repeated requests for medical updates were only necessary because Mr. Eckles repeatedly refused to cooperate with CSX's legitimate attempt to obtain updated information. *See id.* at 1137 ("[W]here, as here, the employer makes multiple attempts to acquire the needed information, it is the employee who appears not to have made reasonable efforts." (citation omitted)). Indeed, Mr. Eckles makes no claim that CSX continued to request any additional information after he finally sent in the letter from his doctor in December 2007.

Thus, the Court finds that Mr. Eckles has failed to come forth with any evidence suggesting that CSX violated 42 U.S.C. § 12112(d)(4)(A).

### B. "Imposing" Medical Restrictions upon Mr. Eckles

While the ADA requires employers to make reasonable accommodations for disabled employees, "[n]othing in [the ADA] shall be construed to require an individual with a disability to accept an accommodation, aid, service, opportunity, or benefit which such individual chooses not to accept." 42 U.S.C. § 12201(d).[5] Mr. Eckles argues that CSX violated that provision by unilaterally imposing medical restrictions upon him, which he never wanted and which he "tried over and over to dump," so that he could work "as just another yardmaster." [Dkt. 44 at 11.]

Neither party has cited any case interpreting 42 U.S.C. § 12201(d). Indeed, neither party has addressed the legal standards that the Court must apply to determine whether a violation of § 12201(d) occurred—or even whether a violation of it constitutes an actionable claim at all, *see*

---

[5] But if the rejection means the employee cannot perform the essential functions of the job, the employee can be terminated. *See* 29 C.F.R. § 1630.9(d) ("[I]f [an] individual rejects a reasonable accommodation…, that is necessary to enable the individual to perform the essential functions of the position held or desired, and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability.").

*Doukas v. Metropolitan Life Ins. Co.*, 950 F. Supp. 422, 425 n.2 (D.N.H. 1996) ("The complaint also alleges that defendant violated the section of Title V called 'Miscellaneous Provisions', 42 U.S.C. §§ 12201-12210. The court finds that a plaintiff cannot sue directly under said section, however, as nothing therein indicates that Congress intended a private right of action.").[6]

Whatever the legal standards may be, the Court rejects a factual matter the claim that CSX foisted the accommodations upon Mr. Eckles. The record here establishes that Mr. Eckles' physician and Conrail jointly agreed to the accommodations. [Dkt. 1 at 4.] And far from wanting no accommodations—like being free from having to work the third shift—Mr. Eckles' first, heavily litigated, ADA lawsuit was designed to obtain even greater accommodations than those he has received. *See Eckles v. Consolidated Rail Corp.*, 890 F. Supp. 1391, 1401 (S.D. Ind. 1995) ("Eckles insisted that the only reasonable way to accommodate his disability was an assignment to the ground-level office at Hawthorne Yard without third shift responsibilities [even though his seniority didn't qualify him to work at that location]."), *aff'd*, 94 F.3d 1041 (7th Cir. 1996), *cert denied*, 520 U.S. 1146 (1997) (table). He enjoyed the benefits of those accommodations for many years with—giving him the benefit of the inferences—only a handful of requests to terminate them, spaced out over many years. Those requests were obviously half-hearted because, for example, when CSX told him in November 2007 that his accommodations were in jeopardy without updated medical information, he sent CSX a copy of the 1999 letter assuring him that his accommodations would continue. [Dkt. 31-3 at 31-32; 31-6 at 35.] Indeed even his Complaint continues to maintain that he needs the medical accommodations. [Dkt. 1 at 4.] If

---

[6] In this regard, the Court notes that § 12201(d) contains no specific prohibition against employer conduct—unlike other clearly actionable sections of the ADA. *See, e.g.*, 42 U.S.C. § 12112(a) ("**No covered entity shall** discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" (emphasis added)).

Mr. Eckles wanted to reject the accommodations—and potentially lose his employment if he couldn't perform his job without them—he was required to give CSX reasonable notice of that rejection. He never did.

### III.
#### CONCLUSION

Accordingly, the Court **GRANTS** CSX's motion for summary judgment, [dkt. 28], and **DENIES** Mr. Eckles' cross-motion for summary judgment, [dkt. 43]. Final judgment shall now issue in favor of CSX and against Mr. Eckles on all counts of Mr. Eckles' Complaint.

Mr. Eckles' motion to continue the trial date, [dkt. 49], is **DENIED AS MOOT**.

11/12/2010

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

John William Emry Jr
johnemrylaw@att.net

John B. Lewis
BAKER & HOSTETLER LLP
jlewis@bakerlaw.com

Michael Scott McIntyre
BAKER & HOSTETLER LLP
smcintyre@bakerlaw.com